J-A27025-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| CARLOS DIETRICH | : | |
| | : | |
| Appellant | : | No. 1797 EDA 2019 |

Appeal from the Judgment of Sentence Entered January 3, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0003887-2017

BEFORE:  STABILE, J., NICHOLS, J., and COLINS, J.[*]

MEMORANDUM BY NICHOLS, J.:                    **FILED JUNE 17, 2021**

Appellant Carlos Dietrich appeals from the judgment of sentence imposed following his convictions for promoting prostitution, corruption of a minor, involuntary servitude, trafficking in minors, kidnapping, and three counts of conspiracy.[1]  Appellant challenges the exclusion of evidence relating to prior allegations of sexual conduct by the victim, the sufficiency and weight of the evidence, the trial court's jury instructions, and his sentence.  We affirm.

The trial court summarized the underlying facts of this matter as follows:

At trial, in her very thorough and highly credible and compelling testimony, the [victim], U.P.T., vividly described all of the relevant events.  She testified that she had first met [Appellant], who until

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 5902(b)(1), 6301(a)(1)(i), 3012(b), 3011(b), 2901(a)(2), and 903, respectively.

the time of his arrest, she knew only as Ten-Ten or Tim-Tim, while she was a 16-year-old tenth grade student at a store near the high school she had been attending. At first, they were merely casual acquaintances. This relationship gradually evolved into a closer more personal one after he had wooed her romantically.

She related that on one Friday night, while she was spending the night at the home of her best friend, [D.R.], she texted [Appellant] and asked him to get her some liquor for [D.R.'s] birthday party the next evening; he said he would do so but it had to be later. When he picked her up at [D.R.'s] home the next day, he had a man with him called "Money" and, instead of taking her to the store to get some liquor as she expected, they transported her in a vehicle to the Roosevelt Inn.

Along the way, [Appellant] repeatedly told her that she should have sex with other people to "Make money for us." She had initially responded that she "didn't feel comfortable with it because of past situations" she had been in; at first he asked her mildly but over time he became more forceful. They slept together for a while when they arrived at the Inn after which he took her to a store and bought her something to eat; after that he picked up a woman named "Bacardi." They took her to a store and had her nails done and bought her bras and panties and went back to the Roosevelt Inn.

Once back at the Roosevelt Inn, [the victim] was kept isolated in a [rented] room . . . where [Appellant and his cohorts] repeatedly cajoled [the victim] into agreeing to working as a prostitute for them. Bacardi took pictures of her wearing the underwear they bought for her and posted them on Back Page, a website for soliciting escorts and prostitutes, giving her the trade name Diamond; though neither of them actually threatened to physically harm her, she cooperated with the venture for fear that if she refused or sought any assistance from anyone it might result in physical injury to herself and anyone who tried to render her assistance. This fear was aroused by the angry demeanor they had displayed whenever she tried to express her disapproval or reluctance of the situation.

Appellant and his cohorts gave this sixteen-year-old liquor and marijuana, purportedly to calm her down. After she became high, she began prostituting herself for them. While she could not recall all details because she had been high and drunk all the time; she concretely related the process of how either Ten-Ten, Bacardi or

Money arranged "dates" for her. She stated that Bacardi had remained close by all of them "for her protection." She remembered quite clearly the sexual acts that she had performed and the fact that she had been required to hand over all the proceeds for those sexual acts performed to them.

At one point, she described receiving a text from her friend [D.R.] asking where she was because she had not appeared at school or responded to her inquiry of her whereabouts. She did not reply at first, but later texted her back and told her she was fine and expected to be back when school resumed on Tuesday. On Tuesday when she was briefly left alone at one point, she successfully texted [D.R.] and told her what was going on; [D.R.] promised to get her cousin to come rescue her but she told her not to do so because they were still at the Inn and she was afraid they might injure her and the cousin.

On Wednesday, [Appellant] and his conspirators left the Roosevelt Inn without her, having given her directives and the impression that they were arranging to transfer her to a different motel to resume their prostitution operation. When she was alone in their room, the Inn employees told her she couldn't stay there because no one had paid for the room. She walked to the lobby and sat on the couch to await [Appellant] as instructed.

Thankfully, in the interim, [D.R.] had reported the incident to their school that morning and the school officials immediately contacted the Philadelphia Police Department. As a result, police officers arrived at the Roosevelt Inn while she was still seated in the lobby. As she was getting into the police car, she panicked when she saw Money and another man approaching, and assumed he was coming to get her from the Inn. She pointed him out to the police and they arrested him. At trial upon presentation by the Commonwealth, she identified a corroborating still from the Inn's surveillance camera that displayed her, Ten-Ten, and Bacardi together at the Inn.

*     *     *

[At trial, t]he Commonwealth called [D.R.,] who credibly confirmed all of the events of which she was personally aware as described by the [victim]. She added the clarification that on the Wednesday morning after she had been told by the victim what was going on, with whom she knew as Tim-Tim or Ten-Ten. She verified her report to the school counselor who had then relayed this same information to the dean who then communicated it to

- 3 -

the school police who reported it to the Special Victims Unit (SVU), who came and rescued the victim and, after they interviewed them both at the station, advised them that they should transfer out of their present school since they might not be safe in that area. [D.R.] corroborated the victim's testimony in every significant aspect.

During the course of her convincing testimony, [D.R.] identified the statement she had given to the police which, as defense counsel noted during cross examination, did contain copies of the text messages between her and the victim. Defense counsel himself read aloud those text messages to the jury and enlisted her confirmation of their content in an apparent attempt to bolster his already discredited victim's ability but failure to seek assistance theory. Again this attempt to dissuade the jury belief of the victim failed because it completely ignored her repeatedly expressed fears of what harm might have ensued to her and others if she tried to obtain help.

Police Officer Sharee Day described responding to the emergency call for help from the high school police, briefly questioning [D.R.], and reporting it to the Sexual Violence Unit of the Philadelphia Police Department (SVU). SVU Detective Joseph Jenkins testified that he had shown the victim a photographic array, to which she had unequivocally identified [Appellant's] photograph. The Commonwealth then called Craig Judd, a Forensic Scientist II DNA Analyst with the Office of Forensic Science, which was an accredited forensic laboratory of the Philadelphia Police Department. He testified as to analyzing DNA samples obtained from the victim's body in the hospital and the samples obtained from [Appellant] and finding that [Appellant's] sperm, along with that of another unidentified male, had been present in the [victim's] vagina.

SVU Detective Kevin Gage described receiving the report of the incident from the police officers who responded with others to the call from the high school police and finding the victim at the Roosevelt Inn, speaking to her briefly in their patrol car and reporting her identification of Money, who they arrested. Detective Gage testified that the victim had also described the [Appellant's] vehicle to him and they drove around the area and found it and directed that it be secured by other officers and confiscated for further inspection. He reported that he had transported the victim to the SVU, obtained a summarized

statement from her and then transported her to the hospital for examination and DNA sample extraction.

Based upon the information he had gleaned and having been provided a description of [Appellant] by the victim, Detective Gage related that he had been able to find records and photographs of [Appellant], the latter of which he turned over to Officer Jenkins to perform the photo array identification. He then described searching [Appellant's] vehicle and finding [Appellant's] ID and a key card, for a room at the Roosevelt Inn which the [victim] had told him was the room she and the others were using; Detective Gage had the owner of the Roosevelt Inn identify the key card and obtained surveillance recordings from him.

At trial, the prosecutor showed the recordings to Detective Gage that had been recovered which he had identified, but did not comment on their content. He also identified his report and the warrant that he had obtained for the [Appellant's] arrest. On cross examination, counsel only established that the Detective had subsequently searched the voluminous Back Page website and, though he found "hundreds" of Diamonds listed, none of them appeared to be the victim. After the Commonwealth and defense counsel moved their exhibits into evidence and the court conducted a colloquy of [Appellant] concerning his decision not to testify, the parties rested.

Trial Ct. Op., 1/29/20, at 5-8.

On October 12, 2018, following a three-day jury trial, Appellant was convicted of all charges. On January 3, 2019, the trial court sentenced Appellant to an aggregate term of twenty-seven to fifty-four years' incarceration followed by twenty-six years' probation. On January 14, 2019, Appellant filed a timely post-sentence motion in which he challenged the weight of the evidence and discretionary aspects of the trial court's sentence.[2]

_____

[2] On August 2, 2019, this Court issued a rule to show cause as to why the appeal should not be quashed as untimely. *See* Order, 8/2/19. Appellant
*(Footnote Continued Next Page)*

After the motion was denied by operation of law, Appellant filed a timely notice of appeal and a court-ordered Pa.R.A.P. 1925(b) statement. The trial court issued a responsive Rule 1925(a) opinion addressing Appellant's claims.[3,4]

On appeal, Appellant raises the following issues:

1. Did the trial court err in applying the Rape Shield Law [18 Pa.C.S. § 3104] and the Pennsylvania Rules of Evidence to prevent [Appellant] from confronting the victim with her past claim to the police of being asked to engage in prostitution and from presenting evidence on the subject where the evidence could have bolstered [Appellant's] impeachment theory that the victim was fabricating the present allegations, particularly where [Appellant] was not charged with sexual offenses under Chapter 31 of the Crimes Code to which the Rape Shield Law

_____

filed a response indicating that his post-sentence motion was timely filed on Monday, January 14, 2019, which is also reflected on the timestamped copy of the motion included in the record. This Court discharged the rule to show cause and referred consideration of Appellant's response to this panel.

Although January 13, 2019 was ten days from the date Appellant was sentenced, it was a Sunday. *See* 1 Pa.C.S. § 1908 (stating that when the last day of a statutory period falls on a Saturday or Sunday, such day shall be omitted from the time computation). Therefore, Appellant's post-sentence motion, filed on Monday, January 14, 2019, was timely.

[3] The trial court concluded that Appellant failed to properly preserve his weight claim in his post-sentence motion or his Rule 1925(b) statement.

[4] While Appellant's direct appeal was pending, he filed a motion for relief with the trial court, alleging that the trial court erred in allowing court staff to instruct the jury *ex parte*. On September 5, 2019, the trial court held a brief hearing at which it disagreed with Appellant's claim, noted that there was no record of such an incident having occurred, and explained that any alleged errors with the jury instructions should have been raised in the Rule 1925(b) statement. *See* N.T. Mot. Hr'g, 9/5/19, at 8-12. On October 17, 2019, the trial court denied Appellant's motion, concluding that it did not have jurisdiction to review the issue. *See* N.T. Mot. Hr'g, 10/17/19, at 4.

was applicable, in violation of the [Appellant's] constitutional rights of confrontation and to due process of law?

2. Whether the evidence was insufficient as a matter of law to support [Appellant's] conviction for kidnapping in violation of 18 Pa.C.S. § 2901, where the Commonwealth failed to prove beyond a reasonable doubt that the victim was removed or confined in a place of isolation by force, threat or deception?

3. Whether the evidence was insufficient as a matter of law to support [Appellant's] conviction for involuntary servitude in violation of 18 Pa.C.S. § 3012, where the Commonwealth failed to prove beyond a reasonable doubt that the victim was subjected to involuntary servitude by the means proscribed by the statute?

4. Whether [Appellant's] convictions were against the weight of the evidence considering the testimony of the [victim] that was fraught with anomalies and inconsistencies in contrast to the video evidence from inside the Roosevelt Inn showing no men other than [Appellant] and a hotel employee accessing Room 229 throughout the extended holiday weekend, the lack of any Back Page posting of the [victim], and the dearth of text messaging evidence showing any elicit activity occurring at the hotel?

5. Did the trial court properly instruct the jury by repeating the law of conspiracy three separate times on three theories of conspiracy, one of which was not identified as an objective in the Bill of Information, and then improperly impose three separate conspiracy sentences where the Commonwealth only charged [Appellant] with a single conspiracy in violation of [Appellant's] rights under the Fifth and Sixth Amendments to the United States Constitution?

6. Did the trial court err by *ex parte* directing her tipstaff to instruct the jury in some way and behind closed doors at 5:43 P.M. on Friday that if they do not reach a verdict by 6:00 P.M., the jury would be required to return on Monday whereupon the jury returned a guilty verdict several minutes later at 5:51 P.M. and where such a directive, depending upon what the manner and precise wording, could have reasonably affected the deliberative process of the jury by rushing them to verdict?

7. Did the trial court impose an illegal sentence where, for purposes of sentencing, the conviction for kidnapping merged

with the conviction for involuntary servitude and where the conviction for involuntary servitude merged with the conviction for trafficking in minors?

8. Did the trial court abuse its discretion in imposing its sentence, where the trial court failed to state on the record adequate reasons for imposing certain sentences outside and above the sentencing guidelines, considered unsubstantiated factors and imposed an unconstitutionally excessive aggregate sentence of 27 to 56 years of incarceration representing cruel and unusual punishment?

Appellant's Brief at 5-7.

## **Evidence of the Victim's Past Conduct**

In his first issue, Appellant argues that the trial court erred in excluding evidence that the victim previously made allegations of sexual misconduct against another individual in an unrelated incident. Appellant's Brief at 35.

By way of background to this claim, the trial court explained:

On the first day of trial, after the completion of jury selection and before any evidence had been presented, the prosecution moved to preclude the defense from mentioning or referring to the [victim's] prior sexual history, in general, pursuant to the Rape Shield Law, to which [Appellant's] trial counsel specifically stated he had no objection and that he readily agreed. However, just before the trial recommenced the next day, this court upon request did exclude a specific instance of the [victim's] prior sexual history, to which ruling defense counsel objected.

The [Commonwealth] disclosed that, in speaking with the [victim] in preparation for trial the night before, she had been advised by her, and had obtained a police report documenting, that on or about April 28, 2016, the [victim] had reported to the SVU that, when she was 15 years old, she had been taken to Atlantic City and, over the course of a few days, had consensual sex with the 25-year-old male who had transported her there. The referenced male had no connection to [Appellant]. [Thereafter, both parties made argument] concerning [the] admissibility [of that evidence] for impeachment purposes.

As presented, there was no indication of what prompted the report or that any further information was sought, or actions taken, by the police, but the [Commonwealth] did point out that no charges had been filed against anyone as a result of that report. . . .

Within the [Commonwealth's] argument that the report should be precluded as irrelevant, the [Commonwealth] mentioned that, if it were a rape case, it would have been precluded under the Rape Shield Law. She further argued that her current position was that it should also be precluded in cases where the defendant is charged with the crimes in question because its legislative purpose was to protect victims of such crimes from being attacked by scandalous, immaterial, irrelevant and prejudicial matters.

In response, [Appellant's] trial counsel broadly linked irrelevant assumptions. He had essentially debated that, since no charges had been brought against that reported adult individual, the police must not have believed her story and that this lack of prosecution constituted evidence that she might be lying about [Appellant].

Trial Ct. Op. at 12-14.

Ultimately, the trial court ruled as follows:

The set of information as reflected in these report summaries is that [the victim] reported meeting a person who [was] twenty-five years old when she was fifteen and having sex with that person. And that person and/or his girlfriend asking her to prostitute herself in the future. There's no allegation of being held against one's will, basically. She talks about having consensual sex with him and/or him and her and that's it.

So that, in itself, does not give rise to piercing the rape shield instructions. Similarly, why the detectives have not to date pursued criminal charges to be deemed appropriate or not appropriate, for whatever reason, is completely irrelevant. Their investigations or methods [are] not at issue here. So that's not relevant. So I'm not going to permit it.

N.T. Trial, 10/10/18, at 11.

On appeal, Appellant argues that the trial court erred in excluding this evidence at trial. First, he contends that at the time of trial, the Rape Shield

- 9 -

Law did not apply to criminal prosecutions for offenses outside of Chapter 31. Appellant's Brief at 37. Further, Appellant argues that the evidence was relevant in order "[t]o bolster his impeachment theory and challenge the credibility of [the victim]" by "confront[ing the victim] with a similar claim she made to the police less than a year earlier." *Id.* In support, Appellant explains:

> [In the prior matter, the victim] told police after she was found away from home and missing school, that she accompanied an older man and his girlfriend to an Atlantic City Hotel where she was also asked to engage in prostitution. [Appellant's] intent in confronting [the victim] with this earlier statement was not to show that she actually did engage in prostitution. Rather, the confrontation was designed to show that [the victim] contrived a similar story that successfully avoided punishment when she was found by the police in the same or similar precarious position as in the present case.

*Id.* at 38. Appellant argues that the evidence was relevant to his defense that the victim "fabricated the claim of being forced into prostitution only after the police found her in the hotel alone and to avoid harsh punishment for being a runaway and a truant." *Id.* at 38.

The Commonwealth responds that the "evidence of the victim's prior sexual conduct was not relevant and would have misdirected the jury's attention away from [Appellant's] acts and toward a mini-trial of the victim's unrelated history concerning chastity." Commonwealth's Brief at 16. The Commonwealth notes that Appellant claimed that the "evidence was relevant as somehow showing that [the victim] had a history of fabricating stories in order to avoid punishment or being seen as a wrongdoer" but that, as the trial

"court recognized, there was no evidence that this report had been a fabrication." *Id.* at 15. Specifically, the Commonwealth notes that (1) the allegations were still under investigation by New Jersey authorities at the time of Appellant's trial; and (2) there was no evidence that the victim "was under any threat of punishment in either the instant situation or the prior situation defendant sought to introduce." *Id.* Therefore, the Commonwealth contends that "regardless of the applicability of the Rape Shield Law, it was within the trial court's discretion to preclude" this irrelevant evidence. *Id.*

In reviewing Appellant's claim, our standard of review is as follows:

> The admission or exclusion of evidence is within the sound discretion of the trial court, and in reviewing a challenge to the admissibility of evidence, we will only reverse a ruling by the trial court upon a showing that it abused its discretion or committed an error of law. Thus our standard of review is very narrow. To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party.

*Commonwealth v. Lopez*, 57 A.3d 74, 81 (Pa. Super. 2012). This Court has explained that "abuse of discretion is not merely an error of judgment, but rather where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will." *Commonwealth v. Aikens*, 990 A.2d 1181, 1184–85 (Pa. Super. 2010).

This Court has explained:

> Relevance is the threshold for admissibility of evidence; evidence that is not relevant is not admissible. *Commonwealth v. Cook*, 952 A.2d 594, 612 (Pa. 2008); Pa.R.E. 402. "Evidence is relevant

if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact." Our Rules of Evidence provide the test for relevance: evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Pa.R.E. 401. Further, "[t]he court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403.

Under Rule 607, "[t]he credibility of a witness may be impeached by any evidence relevant to that issue[.]" Pa.R.E. 607(b). The Comment to Rule 607 further emphasizes that any evidence offered to impeach the credibility of a witness must be relevant under the Rule 401 relevancy test. Pa.R.E. 607 cmt. In addition, Rule 608 provides that "[a] witness's credibility may be attacked or supported by testimony about the witness's reputation for having a character for truthfulness or untruthfulness." Pa.R.E. 608(a). However, "the character of a witness for truthfulness may not be attacked or supported by cross-examination or extrinsic evidence concerning specific instances of a witness'[s] conduct[.]" Pa.R.E. 608(b)(1).

*Commonwealth v. Leap*, 222 A.3d 386, 390-91 (Pa. Super. 2019) (some citations omitted and formatting altered), *appeal denied*, 233 A.3d 677 (Pa. 2020).

Evidence challenging the credibility of an adverse witness is relevant. *See generally Commonwealth v. Woeber*, 174 A.3d 1096, 1104 (Pa. Super. 2017). However, "a witness may not be contradicted upon a collateral matter" that "has no relationship to the matter on trial." *See Commonwealth v. Johnson*, 638 A.2d 940, 942-43; *see also Commonwealth v. Holder*, 815 A.2d 1115, 1119-20 (Pa. Super. 2003)

- 12 -

(citation omitted) (concluding that a prior rape allegation against a third party was immaterial to whether the defendant assaulted the victim and, therefore, it was a collateral matter unsuitable for cross-examination).

The Rape Shield Law, codified at 18 Pa.C.S. § 3104, precludes the admission of evidence concerning a victim's sexual history.[5]  **See** 18 Pa.C.S. § 3104(a).  Prior to 2019, the Rape Shield Law was limited to cases involving Chapter 31 offenses.  **See Commonwealth v. Schley**, 136 A.3d 511, 517 (Pa. Super. 2016) (holding that the plain language of 18 Pa.C.S. § 3104(a) indicated that it was limited to cases involving Chapter 31 offenses); **see also** 18 Pa.C.S. § 3104(c), (eff. August 27, 2019) (expanding the Rape Shield Law to include enumerated offenses outside of Chapter 31).

Here, as noted previously, Appellant argues that the Rape Shield Law was inapplicable in the instant case because he was not charged with a Chapter 31 offense.  Further, he asserts that the evidence was relevant for

---

[5] At the time of Appellant's trial, the statute read, in pertinent part, as follows:

> Evidence of specific instances of the alleged victim's past sexual conduct, opinion evidence of the alleged victim's past sexual conduct, and reputation evidence of the alleged victim's past sexual conduct shall not be admissible in prosecutions under this chapter except evidence of the alleged victim's past sexual conduct with the defendant where consent of the alleged victim is at issue and such evidence is otherwise admissible pursuant to the rules of evidence.

18 Pa.C.S. § 3104(a) (subsequently amended eff. Aug. 27, 2019).

purposes of impeachment. In addressing Appellant's claims, the trial court explained:

> [At trial, Appellant's sole claim was that] the evidence of the former incident was vaguely relevant in that it somehow called into question the [victim's] veracity concerning the case at hand. This farfetched analysis did [not] hold any merit. As presented, this irrelevant and immaterial evidence constituted a proposed prejudicial infringement upon the victim's privacy rights for no valid purpose.
>
> *       *       *
>
> While it is correct that this [c]ourt deemed that the proposed evidence of the former incident as prohibited by the legislative intent of the RSL, it also ruled in the alternative, that it was totally irrelevant and immaterial and thus inadmissible under the general rules of evidence. It was patently obvious that a single previous voluntary sexual encounter with an adult, which indisputably did not involve prostitution or in any way demonstrate a "propensity to fabricate such claims," had no relevance whatsoever to whether the [victim] was being truthful about being forced into prostitution by Appellant. [Trial c]ounsel's vaguely linked insinuations that it somehow was relevant to her reliability were patently fallacious.
>
> Moreover, trial counsel's proposed method of admission of this hearsay information was irrevocably flawed. [Trial c]ounsel attempted at trial to introduce the victim's report of the prior incident through questioning of Detective Kevin Gage about the report. This backdoor method constituted an inversion of the hearsay rules governing the use of prior inconsistent statements to impeach witnesses. Her report about her prior sexual encounter with an adult was frankly not inconsistent with anything to which she testified at trial. It was only counsel's squalid imagination that could construe her report as being somehow indicative that she had previously engaged in prostitution or had a tendency to invent claims of being coerced into doing so. This [c]ourt had already ruled that the report was inadmissible itself as immaterial and irrelevant, and the victim did not testify about that event herself. Nothing within the testimony would have triggered a permission for Detective Gage to describe this inadmissible

- 14 -

hearsay which could not have served any legitimate probative purpose.

Trial Ct. Op. at 14-16.

Based on our review of the record, we discern no abuse of discretion by the trial court. *See Lopez*, 57 A.3d at 81; *see also Aikens*, 990 A.2d at 1184–85. As the trial court noted, there was no indication that the victim fabricated the allegations against the individual in the unrelated matter. *See* Trial Ct. Op. at 16. Further, the details of those allegations had no bearing on the charges against Appellant. Therefore, the trial court did not abuse its discretion in excluding that evidence at trial.[6] *See Johnson*, 638 A.2d at 942-43; *see also Holder*, 815 A.2d at 1119-20. Accordingly, Appellant is not entitled to relief.

## Sufficiency of the Evidence

Appellant next challenges the sufficiency of the evidence supporting his convictions for kidnapping and involuntary servitude. Appellant's Brief at 44. With respect to kidnapping, Appellant claims that the Commonwealth failed to prove that the "removal or confinement was by force, threat or deception" or that the victim was confined in a place of isolation. *Id.* at 46. Appellant contends that "by [the victim's] own account, she willingly went with

---

[6] Because we agree with the trial court's conclusion that the evidence was inadmissible under the Pennsylvania Rules of Evidence, it is unnecessary to address the applicability of the Rape Shield Law. *See Schley*, 136 A.3d at 517 (reiterating that "evidence is admissible only if it is relevant and material under the traditional rules of evidence," regardless of the applicability of the Rape Shield Law).

[Appellant]" to the Roosevelt Inn and had consensual sex with him. *Id.* Appellant argues that the victim was not in isolation because she testified that "the hotel employees knew of her presence," there was video footage of her "moving freely" around the hotel, and she was "out and about in the community many times . . . [on] trips to the bodega, Target and Old Navy." *Id.* at 47. Further, Appellant asserts that the victim "had her phone and was constantly calling and texting D.R. and other family members throughout the weekend." *Id.* at 54. Therefore, Appellant claims that there was insufficient evidence to support his conviction for kidnapping.

Appellant also argues that if we conclude that there was insufficient evidence to establish kidnapping, "then this Court should likewise reverse his conviction for involuntary servitude because the Commonwealth did not prove beyond a reasonable doubt that [the victim] was subjected to involuntary servitude by any of the other proscribed means set forth in this statute." *Id.* at 51.

The Commonwealth responds that Appellant's "argument relies on [the victim's] testimony that she initially went with [Appellant] willingly and that she did not describe any overt threat or force by [Appellant]." Commonwealth's Brief at 18. However, the Commonwealth contends that "[t]his self-serving view of the evidence is contrary to the standard of review and ignores most of the surrounding facts and circumstantial evidence." *Id.* at 19.

The Commonwealth argues that the victim's "isolation from the usual protections of society was confirmed by the fact that she was not rescued from [Appellant's] trafficking scheme for over three days." *Id.* at 22. The Commonwealth notes that "[a]lthough [the victim] had limited access to her cell phone, [Appellant] made her remove her password so he could access it," and the victim "did not respond to voice calls from D.R. or her mother, but falsely reassured them over text message that she was safe." *Id.* The Commonwealth argues that the evidence demonstrates that the victim "was afraid for the safety of her loved ones and concerned about the repercussions if she alerted them to [Appellant's] crimes." *Id.*

Finally, the Commonwealth asserts that, because there was sufficient evidence to prove kidnapping, Appellant is not entitled to relief on his involuntary servitude claim. *Id.*

In reviewing a challenge to the sufficiency of the evidence, our standard of review is as follows:

> Because a determination of evidentiary sufficiency presents a question of law, our standard of review is *de novo* and our scope of review is plenary. In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt. [T]he facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. It is within the province of the fact-finder to determine the weight to be accorded to each witness's testimony and to believe all, part, or none of the evidence. The Commonwealth may sustain its burden of proving every element of the crime by means of wholly circumstantial evidence. Moreover, as an appellate court, we may not re-weigh

the evidence and substitute our judgment for that of the factfinder.

***Commonwealth v. Palmer***, 192 A.3d 85, 89 (Pa. Super. 2018).

A person is guilty of kidnapping of a minor if he unlawfully removes a person under 18 years of age a substantial distance under the circumstances from the place where he is found, or if he unlawfully confines a person under 18 years of age for a substantial period in a place of isolation, with any of the following intentions:

(1) To hold for ransom or reward, or as a shield or hostage.

(2) To facilitate commission of any felony or flight thereafter.

(3) To inflict bodily injury on or to terrorize the victim or another.

(4) To interfere with the performance by public officials of any governmental or political function.

18 Pa.C.S. § 2901(a.1). "A removal or confinement is unlawful within the meaning of subsection (a.1) if it is accomplished by force, threat or deception[.]" 18 Pa.C.S. § 2901(b)(1).

A person commits involuntary servitude if "the person knowingly, through any of the means described in subsection (b), subjects an individual to labor servitude or sexual servitude." 18 Pa.C.S. § 3012(a). Section 3012(b) sets forth the means by which a person may be subjected to involuntary servitude, which includes "[k]idnapping or attempting to kidnap any individual." 18 Pa.C.S. § 3012(b)(3).

Here, the trial court addressed the sufficiency of the evidence supporting Appellant's kidnapping conviction as follows:

There was no question that Appellant had removed the victim from her friend's house by falsely implying that he was going to take her to a liquor store. He confined her, coerced her into becoming a prostitute, by deception, by isolation, inebriation, and by at least the tacit threat of force. He and his cohorts had unlawfully removed the victim a substantial distance and confined her to facilitate commission of multiple felony-graded offenses . . . including promoting and keeping a house of prostitution, (F1); involuntary servitude, (F1); and trafficking in minors, (F1). The act does not define the degree of force or deception required and therefore any extent of such actions will suffice.

\* \* \*

[W]ithin his weight-of-the-evidence claim, Appellant disparaged the Commonwealth's case by claiming that the evidence, as he had characterized it, showed that the victim had the physical ability to simply walk away from the Roosevelt Inn and the other places that Appellant had transported her at any time. That contention implied that there was no evidence of any forceful removal or confinement. That affirmation, however, ignored the victim's consistently and credibly expressed intense fear of the demeanor of Appellant and his associates. The evidence firmly established directly and circumstantially that she had reasonably discerned that any attempt to leave or to seek assistance would have resulted in physical harm to herself and to anyone from whom she sought such aid.

\* \* \*

Simply stated, a reviewing court cannot find the evidence to have been insufficient simply because an appellant distorted that evidence or provided his own self-serving interpretation of it. It is widely recognized that an appellant who challenges the evidence must demonstrate that the actual evidence presented had been insufficient to prove his guilt; he cannot solely rely on his own mischaracterization of a few pieces of it. In this case, although Appellant did not actually distort the evidence of physical compulsion, he has sought the reviewing court to ignore its most obvious or common sense meaning and all relevant surrounding threatening and coercive circumstances that this teenage victim had reasonably perceived.

Trial Ct. Op. at 23-27 (some formatting altered).

With respect to involuntary servitude, the trial court explained:

In this case, the victim was kidnapped and transported under false and bullying pretenses. A scheme involving coercion, isolation, coupled with alcohol and marijuana ingestion as well as fear of resulting harm by multiple people was concretely employed throughout the process. The claim that the prosecution had not proven that Appellant had not exerted any of those means reflected another self-serving misinterpretation of the evidence. Appellant and his associates had pressured the victim into being his prostitute for the purpose of generating income for themselves through the use of collective tacit force employed by multiple individuals.

*Id.* at 28.

Based on our review of the record, and viewing the evidence in the light most favorable to the Commonwealth as verdict winner, we agree with the trial court that there was sufficient evidence to support Appellant's convictions for kidnapping and involuntary servitude. *See Palmer*, 192 A.3d at 89. With respect to kidnapping, the evidence established that Appellant took the minor victim to the Roosevelt Inn, where she was kept in isolation for three days. *See* 18 Pa.C.S. § 2901(a.1). During that time, Appellant also committed involuntary servitude by arranging for the victim to have sex with other men in exchange for money. *See* 18 Pa.C.S. § 3012(a). Under these circumstances, Appellant is not entitled to relief.

## Weight of the Evidence

Appellant next claims that the verdicts were against the weight of the evidence. Appellant's Brief at 51. In support, Appellant challenges the

victim's credibility and argues that "the lack of such evidence was so compelling that to ignore it or even to give it equal weight with [the victim's] testimony was not based on sound reason." *Id.* at 54-55.

When reviewing a weight claim, our standard of review is as follows:

The weight of the evidence is a matter exclusively for the finder of fact, who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. A new trial is not warranted because of a mere conflict in the testimony and must have a stronger foundation than a reassessment of the credibility of witnesses. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice. On appeal, our purview is extremely limited and is confined to whether the trial court abused its discretion in finding that the jury verdict did not shock its conscience. Thus, appellate review of a weight claim consists of a review of the trial court's exercise of discretion, not a review of the underlying question of whether the verdict is against the weight of the evidence. An appellate court may not reverse a verdict unless it is so contrary to the evidence as to shock one's sense of justice.

*Commonwealth v. Gonzalez*, 109 A.3d 711, 723 (Pa. Super. 2015) (*en banc*) (citations omitted and formatting altered).

Here, as noted previously, the trial court concluded that Appellant failed to properly preserve his weight claim. Specifically, the trial court explained:

Within this general claim, no reasons had been provided within the Rule 1925(b) statement nor within any post-sentence motion by Appellant as to why the verdicts had been "against the weight of the evidence." Frankly, zero supporting evidence been presented within the bald and vaguely recited assertions. Rather, it was broadly claimed that the victim's testimony had been "rife with inconsistencies and contradictions" because the video from the Inn, which simply showed the victim with [Appellant] and Bacardi walking with the victim, and the failure to produce the

Back Page posting or the text messaging evidence (the latter being blatantly false since [Appellant's] trial counsel himself had read them to the witness in open court) incontrovertibly proved her ability to walk away were patently fallacious mischaracterizations of their import.

Trial Ct. Op. at 28-29.

Based on our review of the record, we agree with the trial court that Appellant waived his weight claim. **See Commonwealth v. Freeman**, 128 A.3d 1231, 1248-49 (Pa. Super. 2015) (concluding that the appellant waived his challenge to the weight of the evidence where his Rule 1925(b) statement failed to specify which verdicts were against the weight of the evidence and did not offer specific reasons as to why the verdicts were against the weight of the evidence). Therefore, he is not entitled to relief.[7]

### *Ex Parte* Jury Instruction

Appellant also argues that the trial court erred by allowing court staff to instruct the jury *ex parte*. Appellant's Brief at 58. However, Appellant did not raise this issue with the trial court or in his Rule 1925(b) statement. Instead, Appellant raised the issue for the first time in a supplemental Rule 1925(b) statement, which the trial court rejected as having been filed without leave of court. **See** Trial Ct. Op. at 3-4. Therefore, this claim is waived. **See** Pa.R.Crim.P. 647(C) (stating that "[n]o portions of the charge nor omissions

---

[7] In any event, even if properly preserved, we would find no abuse of discretion by the trial court in rejecting Appellant's weight claim. **See Gonzalez**, 109 A.3d at 723 (stating that the jury, as fact-finder, is entitled to make credibility determinations concerning the victim's testimony and weigh that testimony against the other evidence presented at trial).

from the charge may be assigned as error, unless specific objections are made thereto before the jury retires to deliberate"); ***Commonwealth v. Knight***, 241 A.3d 620, 634 (Pa. 2020) (concluding that the appellant waived his challenge to the court's jury instructions by failing to timely object); Pa.R.A.P. 302 (stating that "[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal").

**Conspiracy Convictions**

Appellant also raises two claims regarding his conspiracy convictions. First, he challenges the trial court's jury instruction on conspiracy. Appellant's Brief at 59-60. Second, he argues that the trial court illegally sentenced him on three separate conspiracy charges although only one count of conspiracy was listed in the criminal information. ***Id.***

By way of background to these issues, the Commonwealth filed a criminal information charging Appellant with one count of conspiracy. ***See*** Criminal Information, 5/19/17, at 1. Within the conspiracy charge, the Commonwealth listed three criminal objectives: kidnapping, promoting prostitution, and trafficking in minors. ***Id.*** At the conclusion of trial, both the Commonwealth and Appellant's trial counsel agreed to three separate jury instructions on conspiracy, each of which would focus on a separate underlying criminal objective. ***See*** N.T. Trial, 10/12/18, at 11-13. Specifically, the Commonwealth requested an instruction on conspiracy with respect to trafficking in minors, involuntary servitude, and promoting prostitution. ***Id.*** at 11-12. Appellant's trial counsel indicated that he agreed. ***Id.*** at 14. The

- 23 -

parties also agreed to list those crimes as separate charges on the verdict sheet. *Id.* at 13; 17-19. Ultimately, after the jury returned a guilty verdict on all three conspiracy charges, the trial court imposed concurrent sentences for each count.

On appeal, Appellant claims that by instructing the jury on conspiracy for three separate criminal objectives, the trial court "overemphasized the law of conspiracy." Appellant's Brief at 56. Further, he alleges that "although the issues were ultimately submitted to a jury, [he] was denied his notice guarantee since the bills of information charged him with only one count of conspiracy with exposure to only a twenty-year maximum term of imprisonment as opposed to three counts of conspiracy with exposure up to a sixty-year maximum term of imprisonment." *Id.* (citing ***Apprendi v. New Jersey***, 530 U.S. 466 (2000)). Further, Appellant contends that the trial court "added two separate counts of conspiracy, one of which was for an objective not identified in the count of criminal conspiracy charged." Appellant's Brief at 57. Appellant argues that although the trial court imposed concurrent sentences on the three separate conspiracy convictions, he faces "additional penal exposure in the future should he ever violate his probation." *Id.* Therefore, Appellant requests that we "vacate his conspiracy sentences and remand for resentencing on a single count of conspiracy." *Id.* at 58.

The Commonwealth responds that "defense counsel expressly agreed for the jury to be instructed on three separate conspiracy charges" and "never objected to the instructions as given." Commonwealth's Brief at 29.

Therefore, the Commonwealth argues that Appellant waived his challenge to the jury instruction on conspiracy. *Id.* at 28. Further, the Commonwealth asserts that "[t]o the extent [Appellant] challenges the implicit nature of [the] amendment which was not initiated by a formal motion to amend [he] once again never challenged the charges as given." *Id.* Therefore, the Commonwealth asserts that "[Appellant's] conspiracy charges, to which he acquiesced, were proper." *Id.* at 31.

Initially, to the extent Appellant challenges the trial court's jury instruction on conspiracy, Appellant acknowledges that trial counsel did not object to that instruction at trial. *See* Appellant's Brief at 57. Indeed, the record reflects that Appellant explicitly agreed to the trial court's jury instruction as it pertained to his charges for conspiracy to commit involuntary servitude, trafficking in minors, and promoting prostitution. *See* N.T. Trial, 10/12/18, at 12-19. Therefore, Appellant's claim is waived. *See* Pa.R.Crim.P. 647(C); *see also Knight*, 241 A.3d at 634.

As to Appellant's due process claim,

> our standard of review is *de novo* and the scope of review is plenary. Due process requires a criminal statute to give fair warning of the conduct prescribed, and the criminal information must provide fair notice of every crime of which a criminal defendant is accused. The notice must be "sufficiently specific so as to allow the defendant to prepare any available defenses should he exercise his right to a trial." The due process requirements ensure that if the Commonwealth prevails at trial, the defendant's conviction is not arbitrary or oppressive.

*Commonwealth v. Widger*, 237 A.3d 1151, 1164 (Pa. Super. 2020) (citations and some quotation marks omitted).

"[U]nder the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Apprendi*, 530 U.S. at 476.

An indictment or criminal information "sets the stage for trial and what the Commonwealth intends to prove." *Commonwealth v. King*, 234 A.3d 549, 563 (Pa. 2020). However, a defendant may receive *de facto* notice of charges through other means, such as factual summaries included in the charging documents. *Id.* at 566. Therefore, even where the criminal information is "insufficient as a matter of due process notice[, it] does not resolve whether the conviction at trial was illegally secured." *Id.* at 563. Instead, where "proper notice would permit the [defendant's] sentence," a defendant's claim is subject to harmless error review.[8] *Id.* at 566.

_____

[8] We note that although Commonwealth has not raised any arguments concerning harmless error, we may conduct a harmless error analysis *sua sponte*. *See Commonwealth v. Hamlett*, 234 A.3d 486, 492 (Pa. 2020) (stating that "*sua sponte* invocation of the harmless error doctrine is not inappropriate as it does nothing more than affirm a valid judgment of sentence on an alternative basis"); *see also Commonwealth v. Moore*, 937 A.2d 1062, 1073 (Pa. 2007) (noting that although the Commonwealth did not include a harmless error analysis in its brief, "an appellate court may affirm a valid judgment based on any reason appearing as of record, regardless of whether it is raised by the appellee").

Here, the trial court concluded that Appellant waived this issue because trial counsel did not object to "what was in effect a tacit allowance of amendments to the bill of information" and, instead, trial counsel "specifically expressed his approval." Trial Ct. Op. at 31 (citing N.T. Trial, 10/12/18 at 13-14). Further, the trial court stated:

> Since [Appellant] was charged with conspiracy in connection with the prostitution charge and was fully aware that the evidence was going to show that his cohorts assisted him in that endeavor as well as in the involuntary servitude and trafficking that facilitated it, he could also not establish that those charges would have altered his defense.

Trial Ct. Op. at 33.

As noted previously, the criminal information charged Appellant with one count of conspiracy, which included three separate underlying criminal objectives. *See* Criminal Information, 5/19/17, at 1. The criminal information also included separate charges for kidnapping, promoting prostitution, trafficking in minors, and involuntary servitude. *Id.* at 1-2. Although the Commonwealth did not give formal notice of its intent to seek separate conspiracy convictions prior to trial, Appellant had *de facto* notice that the Commonwealth could pursue a conviction on more than one criminal objective for conspiracy. *See King*, 234 A.3d at 563. Further, prior to jury deliberations, the Commonwealth replaced the conspiracy to commit kidnapping charge with conspiracy to commit involuntary servitude. *See* N.T. Trial, 10/12/18, at 12-19. Appellant did not object to the modification and

instead explicitly agreed to have each of the three conspiracy charges listed as separate counts on the verdict sheet. *See id.*

Because the jury considered all three conspiracy offenses and found Appellant guilty of each charge beyond a reasonable doubt, his resulting convictions and sentences were not illegal. *See King*, 234 A.3d at 563 (stating that the jury found the defendant guilty of all charges beyond a reasonable doubt and "that the Commonwealth's information was insufficient as a matter of due process notice does not resolve whether the conviction at trial was illegally secured"). Therefore, any deficiency in the Commonwealth's notice is subject harmless error review.[9] *See id.* at 564 (reiterating that "notwithstanding defective notice even in the criminal context, a variance may be deemed harmless where a defendant is fully apprised of the charges against him and able to anticipate and respond to the prosecution's proof" (citation omitted)).

Finally, the record reflects that Appellant's defense strategy was to attack the victim's credibility, emphasize the lack of corroborating evidence, and to argue that the victim was a willing participant in the events alleged by the Commonwealth. *See* N.T. Trial, 10/18/18, at 46-48. Therefore, we agree with the trial court that although the Commonwealth did not provide formal

_____

[9] As indicated previously, the Commonwealth did not raise any arguments concerning harmless error. However, we conclude that under the circumstances of this case, it is appropriate to conduct a harmless error analysis *sua sponte*. *See Hamlett*, 234 A.3d at 492; *see also King*, 234 A.3d at 564.

notice of its intent to pursue separate conspiracy convictions, it did not alter Appellant's defense. *See King*, 234 A.3d at 563. Under these circumstances, where Appellant was aware of the charges against him and able to anticipate and respond to the prosecution's proof, any alleged error was harmless. *See id.* at 563-64. Therefore, Appellant is not entitled to relief.

**Merger**

Appellant argues that his conviction for involuntary servitude should have merged with kidnapping and/or trafficking a minor. In support, Appellant claims:

> In the present case and according to the Commonwealth's evidence, kidnaping was a constituent offense and one of the necessary elements of the primary involuntary servitude offense. Therefore, the two offenses should have merged for sentencing purposes. Likewise, involuntary servitude was a constituent offense and one of the necessary elements of the primary trafficking in minors offense. Therefore, those two offenses should have merged for sentencing purposes.

Appellant's Brief at 63.

The Commonwealth responds that Appellant waived this issue by failing to properly develop his claim or cite to pertinent authority. Commonwealth's Brief at 34. In any event, the Commonwealth argues that Appellant's assertion is meritless because his "many actions over the course of several days did not constitute a single criminal act." *Id.* at 35.

In support, the Commonwealth argues:

> Appellant kidnapped [the victim] by transporting her away from her friends and family and keeping her in an isolated hotel room throughout a long weekend. He committed involuntary servitude

by actively subjecting [the victim] to sexual servitude by keeping her inebriated and coercing her to illegally sell her body multiple times. He separately committed human trafficking by organizing and arranging for men to have sex with [the victim] and monetarily benefiting from that scheme. Although these crimes contained some amount of overlap, defendant went beyond that which was necessary to establish the bare elements of each additional crime.

*Id.* at 35. Finally, the Commonwealth asserts that "even if [Appellant's] actions were considered a single act, his merger claim would still fail because none of the crimes wholly include all the statutory elements of the other." *Id.* at 35-38.

Whether a defendant's convictions merge for sentencing purposes is a question implicating the legality of sentence. As such, our standard of review is *de novo* and the scope of our review is plenary. *Commonwealth v. Baldwin*, 985 A.2d 830, 833 (Pa. 2009).

Section 9765 provides, in part, as follows:

No crimes shall merge for sentencing purposes unless the crimes arise from a single criminal act and all of the statutory elements of one offense are included in the statutory elements of the other offense. Where crimes merge for sentencing purposes, the court may sentence the defendant only on the higher graded offense.

42 Pa.C.S. § 9765. "The statute's mandate is clear. It prohibits merger unless two distinct facts are present: 1) the crimes arise from a single criminal act; and 2) all of the statutory elements of one of the offenses are included in the statutory elements of the other." *Baldwin*, 985 A.2d at 833.

"The preliminary consideration is whether the facts on which both offenses are charged constitute one solitary criminal act. If the offenses stem

from two different criminal acts, merger analysis is not required."

***Commonwealth v. Healey***, 836 A.2d 156, 157-58 (Pa. Super. 2003)

(citation omitted).

This Court has explained that

> [t]he answer to this question does not turn on whether there was a "break in the chain" of criminal activity. Rather, the answer turns on whether "the actor commits multiple criminal acts beyond that which is necessary to establish the bare elements of the additional crime." If so, then the defendant has committed more than one criminal act. This focus is designed to prevent defendants from receiving a "volume discount on crime" . . . .

***Commonwealth v. Robinson***, 931 A.2d 15, 24-25 (Pa. Super. 2007) (*en banc*) (citations omitted).

Here, the trial court concluded that the offenses did not merge for sentencing purposes.[10]  ***See*** Trial Ct. Op. at 33-36.

Based on our review of the record, we conclude that Appellant's involuntary servitude conviction does not merge with kidnapping or trafficking in minors.  ***See Baldwin***, 985 A.2d at 833.  The record reflects that Appellant's crimes were not based on a single criminal act.  Instead, Appellant committed multiple criminal acts over the course of three days, which included transporting the minor victim to the Roosevelt Inn and keeping her in isolation, arranging sexual encounters between the victim and other men, and forcing

---

[10] The trial court rejected Appellant's merger claim based on the statutory elements of each offense.  However, because we conclude that Appellant's crimes did not arise from a single criminal act, we need not address the second part of the merger test.  ***See Healey***, 836 A.2d at 157-58.

the victim to have sex with those men in exchange for money. *See* Trial Ct. Op. at 5-8. Appellant is not entitled to a volume discount for these crimes. *See Robinson*, 931 A.2d 15, 24-25. Therefore, his claim is meritless.

**Discretionary Aspects of Sentence**

Finally, Appellant challenges the discretionary aspects of his sentence. Specifically, he claims that the trial court (1) failed to state the reasons for deviating from the sentencing guidelines; (2) considered an impermissible sentencing factor; and (3) imposed an "unduly harsh and excessive" aggregate sentence by structuring the sentences consecutively. Appellant's Brief at 32-34. However, although Appellant included a Rule 2119(f) statement in his brief, his argument section does not include any discussion of this issue.

The Commonwealth responds that Appellant waived his discretionary sentencing claim by failing to properly develop the issue in his brief. Commonwealth's Brief at 39. In any event, the Commonwealth asserts that Appellant's claim is meritless for the reasons stated in the trial court's opinion. *Id.*

Rule 2119(a) of the Pennsylvania Rules of Appellate Procedure provides that an appellant's "argument shall be divided into as many parts as there are questions to be argued[.]" Pa.R.A.P. 2119(a). Additionally, each issue must be supported by discussion and analysis of pertinent authority. *Id.* An appellant's failure to adhere to these rules may result in waiver. *See Commonwealth v. Murchinson*, 899 A.2d 1159, 1160 (Pa. Super. 2006)

(finding the appellant's claims waived under Rule 2119(a) because he did not develop meaningful argument with specific references to relevant case law and to the record to support his claims); *see also Commonwealth v. Heilman*, 867 A.2d 542, 546 (Pa. Super. 2005) (recognizing that an appellant's failure to provide "such discussion and citation of authorities as are deemed pertinent" may result in waiver); *Commonwealth v. Cornelius*, 856 A.2d 62, 77 (Pa. Super. 2004) (declining to review the appellant's claim where there was limited explanation and development of the argument).

Here, although Appellant included a Rule 2119(f) statement, he did not raise his discretionary sentencing claim in the argument section of his brief. Therefore, this claim is waived.[11]  *See* Pa.R.A.P. 2119(a).

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/17/2021

---

[11] In any event, even if properly preserved, the trial court thoroughly addressed Appellant's sentencing claims and concluded that he was not entitled to relief.  Therefore, we would affirm on the basis of the trial court's analysis of this issue.  *See* Trial Ct. Op. at 36-47.